## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | |
|---|---|
| **GLENN & JOLYNN BRAGG** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **VS.** | )　　**Civil Action No.  SA-06-CV-1129-XR** |
| | ) |
| **EDWARDS AQUIFER AUTHORITY,** *et* | ) |
| *al.* | ) |
| | ) |
| **Defendants.** | ) |

## ORDER

Defendants filed a Motion for Partial Summary Judgment on Plaintiffs' 42 U.S.C. § 1983 Equal Protection and Due Process Claims (Docket No. 131). In the motion, Defendants attempt to show that no genuine issue of material fact exists to support Plaintiffs' Home Place Decision and Home Place Permit equal protection and due process claims, which Defendants assert are the only federal claims that survived this Court's order granting in part and denying in part an earlier motion to dismiss (Docket No. 79). Once summary judgment is granted on the federal law claims, Defendants ask the Court to decline to exercise supplemental jurisdiction over the remaining state law takings claims, and instead, to remand those claims to state court where they more properly belong.

In response, Plaintiffs contend that a genuine issue of material fact exists on the Home Place Decision and Home Place Permit claims. Secondly, they allege that Defendants have failed to address all their § 1983 claims, and thus, cannot succeed in disposing of all their federal law claims.

-1-

**Factual and Procedural Background**

Plaintiffs Glenn and Jolynn Bragg own two pecan orchards in Medina County, Texas. The first orchard is located just north of Hondo, Texas and is referred to as the "Home Place Orchard." Purchased by the Braggs in 1979, the Home Place Orchard consists of 60.81 acres and is comprised of a commercial pecan orchard, the Braggs' home, and pecan processing facilities. The second orchard, purchased in 1983, is located three miles north of D'Hanis, Texas and is styled the "D'Hanis Orchard." It consists of 42.1662 acres and is used exclusively for growing pecans. Both orchards reside atop the Edwards Aquifer (Aquifer).

In 1993, the Texas Legislature enacted the Edwards Aquifer Authority Act (EAA Act), which established a regulatory system to govern use of groundwater from the Aquifer and created the Edwards Aquifer Authority (EAA) to administer it. The EAA Act established a historical preference for users who withdrew groundwater from the Aquifer between June 1, 1972 and May 31, 1993. According to the enabling legislation, existing users had until March 1, 1994 to file a declaration of historical use with the EAA.

The EAA Act did not go into effect as originally scheduled, however, because of constitutional challenges brought against it. The Texas Supreme Court resolved these issues in favor of the Act in *Barshop v. Medina County Underground Water Conservation District*, 925 S.W.2d 618 (Tex. 1996). By the time the *Barshop* ruling came down, the March 1, 1994 deadline had passed, so the EAA set a new deadline of December 30, 1996 for filing historical use declarations. Accordingly, the Plaintiffs timely filed applications for the D'Hanis Orchard and the Home Place Orchard on

December 27, 1996.[1]

After reviewing Plaintiffs' applications for the two orchards, the EAA's General Manager recommended a full denial of the D'Hanis application and a partial denial of the Home Place application. Pursuant to these recommendations, Plaintiffs filed suit on July 28, 1998 against the EAA under the Texas Private Real Property Rights Preservation Act (Property Rights Act), alleging the EAA failed to prepare Takings Impact Assessments. The Texas Supreme Court ultimately resolved this litigation in the EAA's favor in *Bragg v. Edwards Aquifer Authority*, 71 S.W.3d 729 (Tex. 2002).

Around this time, Plaintiffs engaged in two settlement efforts (Settlement Negotiations) that the EAA allegedly thwarted, showing "special animus towards the Braggs (in likely response to their Property Rights Act case)."[2] As averred in the Second Amended Complaint, on two separate occasions, third parties with available water offered to share their water with the Plaintiffs, subject only to the consent of the EAA, which did not come.

The first settlement attempt occurred in October 2001 when Living Water Springs, Ltd. offered to transfer water permit rights to the Plaintiffs in exchange for the Plaintiffs' dismissal of their Property Rights Act suit against the EAA. Although Plaintiffs contend the agreement would have freed the EAA from the then pending suit and from the takings and civil rights claims pled in the current action, the EAA refused to approve the agreement.

---

[1] The Plaintiffs began using water from the Aquifer on the Home Place Orchard in 1979. At the D'Hanis Orchard, the Plaintiffs commenced drawing Aquifer water in February 1995, pursuant to authorization granted by the Medina County Groundwater Conservation District, whom Plaintiffs contend was the only regulatory authority in operation at the time. Prior to this, Plaintiffs state they relied on shallow, non-Aquifer wells for irrigating the D'Hanis Orchard.

[2] Docket No. 32 at 6.

The second settlement attempt took place in 2002 between Plaintiffs and the San Antonio Water System (SAWS). According to Plaintiffs, SAWS offered to transfer some of its irrigation water rights to them in exchange for a release of claims against the EAA similar to the one proffered in the first settlement offer. The Plaintiffs allege the EAA rejected this second offer as well.

On September 21, 2004, the EAA issued a final order completely denying the Plaintiffs' D'Hanis Orchard application (D'Hanis Decision) on the basis that the Aquifer well had been drilled outside the historic use period. On February 8, 2005, the EAA partially granted the Home Place Orchard application (Home Place Decision), permitting Plaintiffs less access to the Aquifer than they had requested.

On November 21, 2006, Plaintiffs filed suit against the EAA, pleading takings claims under TEX. CONST. art. I, § 17 and equal protection and due process claims under 42 U.S.C. § 1983. After Defendants removed the case to federal court on the grounds of federal question jurisdiction, Plaintiffs filed a First Amended Complaint, averring additional § 1983 claims arising from the Settlement Negotiations and from the EAA's imposition of junior/senior rules after the Home Place Decision.[3]

On August 31, 2007, this Court entered an order denying in part and granting in part Defendants' motion to dismiss (Docket No. 79). Specifically, the Court dismissed on statute of limitations grounds Plaintiffs' § 1983 claims arising from the D'Hanis Decision and the Settlement Negotiations. The Court did not dismiss, however, Plaintiffs' § 1983 Home Place Decision and

---

[3] The parties have given these post-Home Place Decision claims the appellation of Home Place Permit claims.

Home Place Permit claims.[4]

Subsequent to the Court's order on Defendants' motion to dismiss, Plaintiffs filed their Second Amended Complaint (Docket No. 80).

Finally, Plaintiffs filed a motion for partial summary judgment alleging that the actions of Defendants in completely denying their D'Hanis Application constituted a per se or categorical taking, entitling them to just compensation under Tex. Const. art. I, § 17. The Court found, however, that even assuming Plaintiffs had a vested property right in the Aquifer water beneath their property, they did not establish that Defendants committed a per se taking against them by denying them access to that water (Docket No. 128).

**Legal Analysis**

<u>Summary Judgment Standard</u>

The Federal Rules provide that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[5] The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of

---

[4] On the issue of whether the Plaintiffs successfully established equal protection and due process bases for their Home Place Decision and Home Place Permit claims, the Court found that given the factually intensive analysis necessary for this inquiry, these issues would best be left for consideration at the summary judgment stage.

[5] Fed. R. Civ. P. 56(c).

a genuine issue of material fact."[6] Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings, but must present evidence setting forth "specific facts showing a genuine issue for trial."[7]

Equal Protection - Home Place Decision

Plaintiffs identify their Home Place Decision equal protection claims as being "that the Defendants treated [them] differently than similarly situated persons by extending the May 31, 1993 deadline for some historic non-exempt use of groundwater established by the EAA Act - but not for the Braggs."[8] This allegedly different treatment arose from the EAA's "grandfathering certain otherwise non-exempt wells drilled after May 31, 1993, but before June 28, 2006 - the same time frame as the Braggs' highest years of water use at the Home Place Orchard."[9]

In particular, Plaintiffs refer to the EAA's 1998 decision to provide a "reasonable grandfather provision" for pre-June 28, 1996 wells located within "subdivisions requiring platting."[10] Plaintiffs contend that because the EAA exercised its discretion in providing a reasonable grandfather provision to one group of landowners, it could and should have done the same for them. Because it did not, Plaintiffs assert the EAA treated them differently than similarly situated landowners. This difference in treatment, they contend, constitutes a violation of their equal protection rights.

---

[6] Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

[7] FED. R. CIV. P. 56(e)(2).

[8] Docket No. 145 at 29. The EAA Act established the historical use period for withdraw of Aquifer water as June 1, 1972 through May 31, 1993. (EAA Act § 1.16(a)).

[9] Docket No. 145 at 29.

[10] Docket No. 145, Exhibit N at 1604.

Defendants reply that Plaintiffs are arguing that an extension provided to exempt wells should also have been provided to non-exempt wells. Because Plaintiffs were subject to the Initial Regular Permit (IRP) scheme, Defendants contend that comparing their treatment with groups that were exempt from such scheme is inapposite.[11] In sum, Defendants argue that Plaintiffs are complaining that they were treated differently than *differently* situated persons, a claim that fails to raise equal protection concerns.

The EAA Act states that "an owner of a well from which the water will be used exclusively for domestic use or watering livestock and that is exempt under Section 1.33 of this article is not required to file a declaration of historical use."[12]

§ 1.33, in turn, states that "a well that produces 25,000 gallons of water a day or less for domestic or livestock use is exempt from metering requirements . . . [with the exception that] a well within or serving a subdivision requiring platting does not qualify for an exempt use."[13]

While the EAA Act does define an exempt well, it does not define what constitutes a

---

[11] Owners of non-exempt wells, unlike those of exempt wells, are subject to the requirements set forth in § 1.16, entitled "Declarations of Historical Use; Initial Regular Permits." According to that section, "An existing user may apply for an initial regular permit by filing a declaration of historical use of underground water withdrawn from the aquifer during the historical period from June 1, 1972 through May 31, 1993." (§ 1.16(a)).

[12] EAA Act §1.16(c).

[13] EAA Act §1.33(a)(c). Apparently, "the purpose of §1.33(c) in excluding wells within subdivisions requiring platting from being exempt wells is to prevent the establishment of substandard subdivisions without organized water and sewer systems and to prevent the proliferation of wells within a subdivision requiring platting that could otherwise be served by a regional purveyor." (Docket No. 145, Exhibit N at 1604).

subdivision requiring platting, nor does it specify by which date exempt wells must be drilled.[14] The EAA set about the task of making these determinations in its 1998 rules. In pertinent part, it decided that "a well that otherwise meets the criteria to be an exempt well is not a well within a subdivision requiring platting if the well owner has a registered on-site sewage treatment facility and the well . . . was in existence prior to June 28, 1996."[15]

It is this 1996 date that troubles Plaintiffs. They argue that if the EAA had the power to extend by three years the well usage date for one group, it could have done the same for them. The problem, however, is that the EAA Act treats exempt and non-exempt wells differently. The Act provides that "an existing user may apply for an initial regular permit by filing a declaration of historical use of underground water withdrawn from the aquifer during the historical period from June 1, 1972 to May 31, 1993."[16] What the EAA Act does not provide, however, is a date by which users must begin withdrawing Aquifer water from exempt wells. In other words, while the Act expressly states the initial date by which IRP-governed wells must have been used, it provides no such date for exempt wells. Therefore, Plaintiffs' argument that the EAA had the authority to establish a 1996 use date for non-exempt wells because it set such date for exempt wells does not align with the language of the EAA Act.[17]

---

[14] This is in contrast to non-exempt wells, which the Act specifies must have been drilled and beneficially used before June 1, 1993.

[15] Docket No. 145, Exhibit N at 1608. June 28, 1996 was the date the EAA Act went into effect.

[16] § 1.16(a).

[17] It is important to emphasize that the 1996 date only applied to exempt wells, not non-exempt IRP-governed wells like Plaintiffs'. In other words, only those landowners who used less than 25,000 gallons of Aquifer water a day for domestic or livestock purposes were entitled to

Because Plaintiffs have never claimed entitlement to exempt status,[18] their challenge to the dates promulgated for exempt wells must fail unless they can show that no rational basis exists for treating exempt and non-exempt wells differently.[19]

In their response brief to the Court's March 14, 2008 order, Defendants observe that the EAA Act "regulates two types of withdrawals from the Aquifer: withdrawals of groundwater made by large users, consisting of municipal, industrial, and irrigation users, and withdrawals made by small users, consisting of domestic and livestock use from small wells."[20] Defendants observe that "in drawing this distinction, the Legislature recognized that some users had a significant impact on the availability of water in the Aquifer and other users, using small quantities of water for strictly domestic or livestock watering, had a de minimis impact."[21] Accordingly, "the Legislature determined that the regulations applied to large water users whose activities significantly impact the Aquifer would be different than the regulations applied to de minimis users whose activities have no practical effect on the Aquifer."[22]

The Court finds such reasoning provides at least a rational basis for distinguishment between

---

benefit from the 1996 date. Plaintiffs have never argued that their need for the water would meet these requirements for exemption.

[18] Under an exempt status, Plaintiffs would be precluded from irrigating their commercial pecan orchards.

[19] "If a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relation to some legitimate end." (Romer v. Evans, 517 U.S. 620 at 631 (1996)).

[20] Docket No. 158 at 6.

[21] *Id*.

[22] *Id*.

the regulations applicable to exempt and non-exempt wells. Specifically, such reasoning provides a rational basis for the Legislature's decision to set a firm 1993 historical use deadline for IRP applicants like the Braggs,[23] while allowing the EAA flexibility to weigh conservation concerns with investor expectations in arriving at a different use date for exempt well users.[24] Because Plaintiffs have never claimed entitlement to exempt well status, their contention that the EAA treatment them differently than similarly situated people fails. Therefore, Defendants' motion for summary judgment on Plaintiffs' Home Place Decision equal protection claims is GRANTED.

Equal Protection - Home Place Permit

Defendants next assert entitlement to summary judgment on Plaintiffs' Home Place Permit equal protection claims. According to Plaintiffs, "Defendants treated the Braggs differently than similarly-situated persons, other holders of IRPs, by using its junior/senior rules to deprive the Braggs of their minimum statutory entitlement of two acre-feet per irrigated acre, guaranteed by the EAA Act."[25]

---

[23] The purpose for concluding the historical use period on the day following the EAA Act's passage was apparently to preclude "landowners from rushing to establish preferred rights through future drilling after the passage of the Act." (*Barshop*, 925 S.W.2d at 632).

[24] The EAA claims the Texas Legislature has validated their approach of setting a later date (or no date at all) for exempt wells, while keeping the EAA Act's 1993 date for non-exempt wells. (*See* Docket No. 158 at 13). In 2007, the Texas Legislature amended § 1.14(e) of the Act. The prior version read, "The authority may not allow withdrawals from the aquifer through wells drilled after June 1, 1993." The new version reads the same as above, but with the following addition: "except for replacement, test, or **exempt wells** or to the extent that the authority approves an amendment to an initial regular permit to authorize a change in the point of withdrawal under that permit." (emphasis added). In other words, the new version of the EAA expressly provides that the EAA may allow Aquifer withdrawals via exempt wells without regard to the date the well was drilled. IRP wells like Plaintiffs', however, are still governed by the Act's June 1, 1993 historical use cutoff.

[25] Docket No. 145 at 33.

-10-

§1.16(e) of the EAA Act provides, in part, that "an existing irrigation user shall receive a permit for not less than two acre-feet a year for each acre of land the user actually irrigated in any one calendar year during the historical period."[26] According to Plaintiffs, the EAA Act "established the amount of permitted withdrawals from the Edwards Aquifer through December 31, 2007 at 450,000 acre-feet per year."[27] In December 2004, the EAA created a "temporary junior/senior or interruptible/uninterruptible structure for IRPs, whereby the permits contained two components: a junior or interruptible component, which could be withdrawn when the Aquifer exceeded certain levels and a senior or uninterruptible component which could be withdrawn unless the Aquifer declined to drought levels."[28]

The purpose of the junior/senior rules was to enable the EAA to "simultaneously comply with the existing statutory cap on annual withdrawals, by issuing senior rights only up to the 450,000 acre-feet/annum cap, and with the EAA Act's requirement that IRPs be issued at minimum irrigator and historical average amounts, by issuing junior rights, which could only be withdrawn at Aquifer levels high enough to support withdrawals."[29] While these junior/senior rules were intended to operate through the end of 2007, the EAA repealed them on March 13, 2007 following the issuance of an

---

[26] The same section of the Act also states than "an existing user who has operated a well for three or more years during the historical period shall receive a permit for at least the average amount of water withdrawn annually during the historic period." (EAA Act §1.16(e)).

[27] Docket No. 145 at 17. The parties dispute whether the 450,000 acre-feet was a cap or a minimum amount subject to increase by the EAA.

[28] Docket No. 131 at 7.

[29] *Id*. "Thus, for example, an irrigation user whose senior rights allow the withdrawal of 1.6 acre-feet per year may be provided with junior rights allowing the user to withdraw an additional 0.4 acre-feet per year, bringing the total withdrawal amount allowed under the permit to 2 acre-feet of water per year." (Docket No. 145, Exhibit M at 8).

adverse advisory opinion by the Texas Attorney General.[30]

Plaintiffs argue that "1) the EAA used its junior/senior rules to deprive the Braggs of their minimum statutory entitlement in 2006; and 2) its application of those rules in that fashion resulted in similarly-situated persons, IRP holders with irrigation permits, being treated differently, because those rules did not deprive all of those permits holders of their minimum entitlements."[31]

As for Plaintiffs' first contention, it can be dismissed as not stating an equal protection claim. It is an attempt to challenge the legality of the junior/senior rules, not whether those rules were applied differently to similarly situated persons.

Plaintiffs' second contention comes closer to alleging an equal protection concern. Plaintiffs have essentially drawn a line along a continuum and said that before the implementation of the junior/senior rules, everyone received water up to that line, with  some receiving water beyond it. After the rules were implemented, however, not everyone received water up to the line. Therefore, Plaintiffs contend that similarly situated people, namely those who used to receive water at least up to the line, were treated differently after the activation of the rules because only some, not all, still received such entitlements.

This purported difference in treatment is not a result of similarly situated people being treated differently, but an expected byproduct of the fact that not all IRP holders were similarly situated before the rules were adopted. In other words, while everyone previously had a shared minimum entitlement, some, but not all, IRP holders had access to water reserves beyond that minimum. Therefore, when a uniformly applied proportionate reduction in water entitlement was administered

---

[30] *See* Docket No. 145, Exhibit M.

[31] Docket No. 145 at 34.

through the junior/senior rules, not all permit holders came away with rights that reached the previous minimum mark. In terms of Aquifer water per acre, those who started out with more entitlement faired better after the uniform reduction than those who started out with less.[32] Thus, Plaintiffs' argument is really that a governmental action applied equally to all parties affected differently situated people proportionately the same. Such a proposition fails to state an equal protection claim.

Additionally, Plaintiffs provide no evidence suggesting the EAA implemented the junior/senior rules in furtherance of a discriminatory intent or purpose.

Finally, while the Texas Attorney General eventually found the rules to exceed the statutory authority of the EAA, such a finding, which the EAA does not concede to be correct, is but a factor to consider in the inquiry of whether the EAA had a rational basis for adopting the junior/senior rules.[33]

The EAA faced the difficult task of trying to reconcile two important, yet competing

---

[32] The EAA Act contains two provisions for determining a user's minimum entitlement. (*See* EAA Act § 1.16(e)). The first, a two acre-feet per year allotment for each acre of land irrigated during any one calendar year during the historical period, applies to all permitted users. The Braggs' minimum entitlement is determined by this provision. The second provision pertains to users who operated a well for three or more years during the historical period and whose average amount of annual water withdraw during that period exceeded two acre-feet per irrigated acre. These users receive a permit for the average annual withdraw amount. Thus, before the junior/senior rules were applied, all users were guaranteed two acre-feet a year for each irrigated acre, but some were entitled to a higher minimum based on their average annual historical use. Therefore, a uniformly applied proportionate reduction in water allotments resulted in different acre-feet per year entitlements for users based on whether they operated under the two acre-feet minimum or the average annual use calculation.

[33] The Fifth Circuit has stated in the due process context that "a violation of state law is alone insufficient to state a constitutional claim under the Fourteenth Amendment." (FM Properties Operating Co. v. City of Austin, 93 F.3d 167, 174 (5th Cir. 1996)).

legislative objectives. The first was to prevent more than 450,000 acre-feet per year of water from being withdrawn from the Aquifer. The second was to ensure that permit holders received their two acre-feet per irrigated acre minimum as mandated under the EAA Act. It is not for the Court to judge the wisdom of the EAA's chosen method to address these concerns, nor is it for the Court to review the correctness of the Texas Attorney General's Advisory Opinion. Rather, it is the Court's limited role to determine whether a case can be made that the actions of the EAA constituted a reasonable attempt to address the complex challenges it faced.[34] On this issue, the Court finds that the EAA's actions met the required minimum threshold.

It follows that Defendants' summary judgment motion as to Plaintiffs' Home Place Permit equal protection claims should be and hereby is granted.

Due Process - Home Place Decision

Plaintiffs allege Defendants "arbitrarily and irrationally interfered with [their] property rights in groundwater by inconsistently applying the historic use period."[35] More specifically, Plaintiffs complain that they were treated differently than owners of subdivisions requiring platting because those owners were purportedly provided a grandfathered extension of the historical use period that the rest of the IRP holders, Plaintiffs included, were not afforded. According to Plaintiffs, because the EAA exercised its discretionary authority to "create entitlements for non-exempt users who had

---

[34] "In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." (F.C.C. v. Beach Communications, Inc., 508 U.S. 307, 313 (1993)).

[35] Docket No. 145 at 38.

-14-

demonstrated use after the end of the EAA Act's historic use period, but before June 28, 1996,"[36] it could have exercised the same authority to benefit them, especially given that the May 1993 to June 1996 time span covered the "highest years of water use at the Home Place Orchard."[37] The EAA's decision to apply a grandfathering rule to some, but not all, allegedly non-exempt wells constituted, in Plaintiffs' view, an arbitrary and irrational interference with their protected property interests in Aquifer water.

In their motion for summary judgment, Defendants assume, for argument's sake only, that Plaintiffs possess a protected property interest in Aquifer water. They correctly observe that for Plaintiffs to succeed on their substantive due process claims, they must show that the government acted "in an arbitrary and irrational way."[38] In making this determination, the Court is restricted to ensuring that a "rational relationship exists between the policy [complained of] and a *conceivable* legitimate governmental objective."[39]

As the Court found in its analysis of Plaintiffs' equal protection claims, a rational basis existed for the EAA to extend the usage date for exempt wells beyond the 1993 historical use deadline. The reasons supporting the extension of the historical use deadline for certain exempt wells, however, did not bind the EAA to adopt rules providing similar extensions for non-exempt

---

[36] *Id.* at 39. While Plaintiffs allege that the EAA's extension of the historical use period applied to non-exempt users, this Court, as discussed in the Home Place Decision equal protection section, agrees with the EAA that the extension applied only to exempt users.

[37] *Id.* at 39-40.

[38] Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15 (1976).

[39] *FM Properties*, 93 F.3d at 174-5 (emphasis original).

wells.[40] As Defendants note, "many cities and counties and industries throughout the Texas Hill Country dependent upon Edwards Aquifer water had increased needs between 1993 and 1996 as the region's population and water demands increased."[41] To have provided extensions of the historical use deadline for non-exempt wells in the region, even if permitted under the EAA Act, could have led to adverse environmental consequences out of sync with the conservation goals of the EAA Act. Therefore, just as the EAA articulated a rational basis for extending the historical use period for exempt wells, a rational basis existed for not making the same extension for non-exempt wells.

Plaintiffs have failed to show that Defendants' actions were arbitrary and irrational. Accordingly, Defendants' motion for summary judgment is granted as to Plaintiffs' Home Place Decision substantive due process claims.

Due Process - Home Place Permit

Plaintiffs also aver substantive due process claims related to the Home Place Permit, alleging "Defendants arbitrarily and irrationally interfered with [their] property rights by imposition of the junior/senior rules."[42] Plaintiffs claim that the junior/senior rules "blatantly and egregiously interfered with [their] property rights in Edwards water and minimum statutory entitlement to Edwards Aquifer withdrawals, thereby violating their right to due process."[43]

---

[40] As explained in the section on Plaintiffs' Home Place Decision equal protection claims, the EAA did not possess the authority to extend the historical use deadline for non-exempt wells. Even if it did, however, it would have been justified in not exercising such discretion for the reasons cited in the remainder of this section.

[41] Docket No. 149 at 11.

[42] Docket No. 145 at 41.

[43] *Id*.

-16-

The Texas Attorney General found that the junior/senior rules violated the EAA Act.[44] Even assuming the Attorney General was correct, "converting alleged violations of state law into federal due process claims improperly bootstraps state law into the Constitution."[45] Instead, such an alleged violation is but a factor to consider in the pertinent inquiry of whether Defendants' actions were arbitrary and irrational.

The EAA faced a formidable quandary - either allow more than the statutorily permitted annual withdrawal of Aquifer water[46] or reduce some permittees' annual minimum guarantee of Aquifer water. Reasonable minds can disagree as to the wisdom of the EAA's ultimate choice, but there is no doubt that the adoption of the junior/senior rules was rationally related to solving the legitimate governmental challenge posed.

Therefore, Defendants' motion for summary judgment on Plaintiffs' Home Place Permit substantive due process claims is granted.

Plaintiff's Other Alleged § 1983 Claims

Plaintiffs contend that Defendants failed to move for summary judgment on their remaining § 1983 claims, which consist of allegations of 1) "unreasonable, arbitrary, and malicious interference with two settlements," 2) "encouragement to the Braggs to seek relief from the Texas Legislature

---

[44] *See* Docket No. 145, Exhibit M.

[45] *FM Properties*, 93 F.3d at 174. Plaintiff argued that because the city council's interpretation of a piece of state legislation was purportedly incorrect, it was therefore irrational. The Fifth Circuit held otherwise, finding that even if the city council "wrongly interpreted House Bill 4, a violation of state law is alone insufficient to state a constitutional claim under the Fourteenth Amendment." (*Id.*).

[46] The parties dispute whether the 450,000 acre-feet level set by the EAA Act was a cap or a minimum amount subject to increase by the EAA.

and twice thwarting those efforts," and 3) an "overall course of conduct" that deprived Plaintiffs of "their constitutional rights to due process and equal protection."[47]

Defendants respond that Plaintiffs are asserting new claims that have not been pled. Additionally, Defendants argue that this Court dismissed any claims related to the settlement negotiations for statute of limitations reasons in its August 31, 2007 order. Finally, Defendants assert there is no basis - either in law or evidence - to support the allegations in Plaintiffs' additional claims.

In its August 31 order (Docket No. 79), the Court held that Plaintiffs' "§ 1983 claims arising from the 2001 and 2002 settlement efforts . . . are now time-barred by the statute of limitations."[48] While no longer seeking to bring claims based solely on the settlement negotiations, Plaintiffs seek to use the facts underlying those claims to support an umbrella claim pertaining to Defendants' alleged improper course of conduct. In other words, Plaintiffs are trying to do indirectly what they cannot do directly. While creative, such effort is precluded by the Court's previous finding that any claims "arising from"[49] the settlement negotiations are barred.

Plaintiffs also allege that they sought relief from the Texas Legislature in 2001 at the advice of the EAA's then general manager. Apparently, Plaintiffs sought an amendment to the EAA Act that would have extended the historical use deadline from 1993 to 1997. This and other amendments were introduced through HB 1540 on March 21, 2001. The EAA opposed the bill and testified to that

---

[47] Docket No. 145 at 23-4.

[48] Docket No. 79 at 10.

[49] *Id.*

effect before the House Natural Resources Committee. Plaintiffs contend "the EAA's efforts to frustrate [their] recourse to the Legislature were successful. After hearing testimony, the House Committee on Natural Resources referred HB 1540 to a subcommittee, from which it never emerged."[50]

Plaintiffs made similar recourse to the state legislature in 2007, supporting a bill that addressed users, like them, that experienced higher annual Aquifer use during the 1993 to 1997 period than they had during the period leading up to 1993. While the bill itself did not pass out of committee, portions of it relevant to Plaintiffs were purportedly inserted as an amendment to the Texas House version of Senate Bill 3. Plaintiffs contend that "due to efforts by the EAA," these amendments were stripped from the bill by the conference committee.[51]

Several problems exist with Plaintiffs' arguments. First, there is no mention anywhere in the live pleadings of facts or claims pertaining to alleged legislative interference on the part of the EAA. Specifically, the two bills identified by Plaintiffs, the supposed advice given by the EAA general manager, and the testimony in opposition to the bills by the EAA are never mentioned in Plaintiffs' Second Amended Complaint. While Plaintiffs do plead general equal protection and due process claims, there is nothing in their pleadings which would even hint that they meant to include EAA actions related to legislative processes.

Second, Plaintiffs have not shown, nor is it clear how they could show, that Defendants' decision to oppose legislation violates their constitutional rights. A governmental agency has the

---

[50] Docket No. 145 at 15.

[51] *Id*. at 20-1.

right to weigh-in on proposed legislation, offering testimony either in favor or in opposition to such legislation. The mere fact that the EAA opposed two bills that Plaintiffs favored, even assuming the EAA's general manager advised Plaintiffs to seek relief from the legislature, does not allege a constitutional wrong.

Third and finally, there is a causation issue. Plaintiffs try to pin responsibility for the failure of their favored legislation on Defendants. The legislative process, however, is complicated. Legislators receive feedback on proposed legislation from many sources and often weigh a myriad of considerations before deciding how to proceed. Once a decision is made, legislators are held responsible. Thus, even if the EAA voiced opposition to the bills in question, it was the unique province of the legislators to make the final decision.

The Plaintiffs' last claim is that even if no specific action violated the Constitution, the EAA's overall course of conduct was constitutionally impermissible. In support of this proposition, Plaintiffs cite to a footnote in a Third Circuit case where the court noted in passing that "a plaintiff may be able to establish liability under § 1983 based upon a continuing course of conduct even though some or all of the conduct complained of would be de minimis by itself or if viewed in isolation."[52]

The Third Circuit, however, was contemplating a hypothetical in which a public employer was accused of retaliating against an employee. Pertinent case law required that "the nature of the

---

[52] Brennan v. Norton, 350 F.3d 399, 419, n. 16 (3rd Cir. 2003). Plaintiffs also cite to the Fifth Circuit case of *John Corp. v. City of Houston*, 214 F.3d 573 (5th Cir. 2000). The cited language, however, merely states that "*In their complaint*, Appellants allege that the City, in undertaking a course of conduct" violated certain constitutional rights. (*Id.* at 576) (emphasis added). In other words, all the court did was summarize how one of the sides presented its claims, not suggest, much less hold, that a course of constitutional conduct can be unconstitutional.

retaliatory acts committed by a public employer be more than de minimis or trivial."[53] Because of this case law, the Third Circuit suggested in dicta that it could be possible for a series of small, but admittedly retaliatory acts to give rise to a constitutional violation, even though none of the retaliatory acts, in and of itself, surmounted the de minimis hurdle.

Plaintiffs try to bootstrap the logic of this circuit's dicta to the facts of this case. *Brennan*'s dicta, however, assumes there are wrongful acts, but that those acts are not significant enough to overcome the de minimis barrier. In Plaintiffs' case, however, there is no de minimis exception to be overcome. Thus, there is no reason to apply a logic that exists only to overcome a particular barrier, when that barrier is not presented.

Additionally, unlike in the situation where there are wrongs that would be unconstitutional but for their diminutive size, Plaintiffs here argue that two (or three, five, etc.) rights can make a wrong. In other words, even if nothing Defendants do is constitutionally impermissible by itself, somehow, when packaged together, these individually constitutional acts comprise one large constitutional wrong. While imaginative, such argument is not tethered to law or logic.[54]

---

[53] *Brennan*, 350 F.3d at 418-9 (citing Suarez Corp. Industries v. McGraw, 202 F.3d 676, 686 (4th Cir. 2000). In context, the *McGraw* court stated that "the employment relationship between the speaker and retaliator creates competing interests between the interests of the public employee, as a citizen, in commenting upon matters of public concern and the interest of the government, as an employer, in promoting the efficiency of the public services it performs through its employees. To properly balance these interests, courts have required that the nature of the retaliatory acts committed by a public employer be more than de minimis or trivial." (*Id*.).

[54] Even if a course of conduct claim of the type asserted by Plaintiffs were permissible, the Court finds insufficient evidence to support its survival past summary judgment.

Remaining State Law Takings Claims

With all the federal claims disposed of, Defendants request that the remaining state law takings claims be remanded to state court. 28 U.S.C. § 1367(c)(3) provides that a federal district court may choose not to exercise supplemental jurisdiction over state law claims if "the district court has dismissed all claims over which it has original jurisdiction." The Fifth Circuit has observed that "district courts enjoy wide discretion in determining whether to retain supplemental jurisdiction over a state claim once all federal claims are dismissed."[55]

Plaintiffs remaining state law takings claims raise important, complex issues of Texas constitutional law. The Court believes the best forum for the adjudication of these claims is state court. Therefore, Plaintiffs' outstanding state law claims are remanded to the 38th Judicial District Court, Medina County, where this case was filed before its removal.

---

[55] Noble v. White, 996 F.2d 797, 799 (5th Cir. 1993).

**Conclusion**

For the reasons set forth herein, Defendants' motion for summary judgment on Plaintiffs' federal law claims (Docket No. 131) is GRANTED. The remaining state law claims are REMANDED to the 38th Judicial District Court, Medina County. All other pending motions are hereby DISMISSED as moot.

It is so ORDERED.

SIGNED this 25th day of March, 2008.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE